[No. D049629. Fourth Dist., Div. One. Aug. 2, 2007.]

DANIEL VERA, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, Respondent;
STATE COMPENSATION INSURANCE FUND, Real Party in Interest.

COUNSEL

Atcheson & Kepler and David M. Kepler for Petitioner.

No appearance for Respondent.

David Masami Goi for Real Party in Interest.

OPINION

**IRION, J.**—Daniel Vera petitioned for review of a decision by the Workers' Compensation Appeals Board (WCAB) denying his petition for reconsideration of a decision awarding him permanent disability benefits in the amount of $18,823.75. The WCAB's decision was premised on the application of the schedule for rating permanent disabilities that went into effect on January 1, 2005 (Cal. Code Regs., tit. 8, § 9805), which Vera argues does not apply to his case.

We granted review, and we now conclude that the WCAB properly denied the petition for reconsideration because the schedule for rating permanent disabilities that went into effect on January 1, 2005, applies to Vera's case. Accordingly, we affirm the decision of the WCAB.

I

FACTUAL AND PROCEDURAL BACKGROUND

On March 14, 2003, while employed as a laborer by Sapper Construction, Vera sustained injury to his neck, back and right shoulder.

At the time of the injury, Sapper Construction's workers' compensation insurance carrier was State Compensation Insurance Fund (SCIF). SCIF paid temporary disability benefits to Vera from March 17, 2003, to February 1, 2005, and permanent disability benefits from February 2, 2005, to September

27, 2005, but disputed the amount of permanent disability benefits that were payable and sought a credit for any amount that it had overpaid.

On April 19, 2004, while Vera was being treated for his injuries, but before he reached the status of permanent and stationary, the Legislature passed a comprehensive reform of the workers' compensation laws. (Stats. 2004, ch. 34, § 30.) Among other things, the Legislature required a change in the schedule by which permanent disability is rated.[1] Under the amended law, by January 1, 2005, the Administrative Director of the Division of Workers' Compensation was to revise the schedule for rating permanent disabilities, using, among other things, "the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (5th Edition)." (Lab. Code, § 4660, subds. (b)(1), (e).)[2] The schedule was revised and became effective on January 1, 2005 (the new schedule).[3] (Cal. Code Regs., tit. 8, § 9805.)

In many cases, the revision to the schedule for rating permanent disabilities impacts the amount that a worker will be compensated for a permanent disability. In this case, the parties stipulated that the old rating schedule is more favorable to Vera than the new rating schedule, with the new schedule resulting in a permanent disability rating of 26 percent, and the old schedule resulting in a permanent disability rating of 59 percent.[4]

In its reform of the workers' compensation laws, the Legislature included a provision describing which injured workers would be covered by the new schedule. (§ 4660, subd. (d).) Section 4660, subdivision (d) states that the new schedule shall apply to all claims, except certain claims that arose before January 1, 2005. "The schedule shall promote consistency, uniformity, and objectivity. The schedule and any amendment thereto or revision thereof shall apply prospectively and shall apply to and govern only those permanent disabilities that result from compensable injuries received or occurring on and after the effective date of the adoption of the schedule, amendment or revision, as the fact may be. For compensable claims arising before January 1, 2005, the schedule as revised . . . shall apply to the determination of

---

[1] "Permanent disability payments are calculated by first expressing the degree of permanent disability as a percentage and then converting that percentage into an award based on a table. (§ 4658.)" (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1320 [57 Cal.Rptr.3d 644, 156 P.3d 1100], fn. omitted (*Brodie*).) The percentage of disability is also referred to as a "rating."

[2] Unless otherwise indicated, all further statutory references are to the Labor Code.

[3] We will refer to the schedule for rating permanent disabilities in effect *before* the new schedule as the "old schedule."

[4] As shown by the record, the award to Vera under the old schedule would be $62,576.25, while the award under the new schedule was $18,823.75.

permanent disabilities when there has been either no comprehensive medical-legal report or *no report by a treating physician indicating the existence of permanent disability*, or when the employer is not required to provide the notice required by Section 4061 to the injured worker." (§ 4660, subd. (d), italics added.)

In an apparent attempt to have Vera's permanent disability rated under the more favorable *old* schedule, just seven days after the Legislature enacted the revisions to the workers' compensation laws Vera's treating physician issued a "Supplemental Primary Treating Physician's Report," dated April 26, 2004, indicating that Vera had a permanent disability (the April 2004 report). The April 2004 report stated: "Mr. Vera's condition is not permanent and stationary at this time, and pursuant to Labor Code Section 4658[, subdivision ](d)(4) it is my opinion that *Mr. Vera does currently have the existence of permanent disability*. Based on this patient's condition and the treatment that [he has] undergone, on a preliminary basis it is this examiner's opinion that [his] permanent partial disability would be consistent with: [¶] Lumbar Spine: No heavy lifting, repetitive bending and stooping. [¶] Right Shoulder: No heavy lifting, no repetitive over shoulder work activity and no pushing/pulling of heavy weighted objects. [¶] At the time that I examine Mr. Vera for permanent and stationary status, I will subsequently render a Primary Treating Physician's Permanent and Stationary Report in the near future."[5] (Italics added.)

The administrative proceedings focused on whether the new schedule or the old schedule governed Vera's claim for permanent disability.

The workers' compensation administrative law judge ruled that the old schedule applied, finding that the injury caused permanent disability of 59 percent.

SCIF petitioned for reconsideration. A divided WCAB panel determined that the new schedule applied. The panel majority ruled that the April 2004 report "is not substantial evidence as to the existence of permanent disability in light of the report itself, subsequent reports, and subsequent treatment, and, therefore, is insufficient to bring this case under the old schedule."[6] It pointed out that the April 2004 report stated (1) that the conclusion was " 'on a

---

[5] In a later report, Vera's treating physician explained the April 2004 report as follows: "In light of the recent legislative changes, I provided you with a supplemental primary treating physicians report dated 4/26/2004 wherein I felt that on a preliminary basis, that Mr. Vera would have permanent disability on the basis of the industrial exposure of 3/14/2003."

[6] The panel also indicated that the only one of the three exceptions in section 4660, subdivision (d) that applied—and the only exception relied on by the administrative law judge—was the exception applicable when there has been "no report by a treating physician

*preliminary* basis' " and (2) that Vera " 'does *currently* have the existence of permanent disability.' " (Italics added.) It also noted that in a June 2004 report, the treating physician stated that Vera " 'remains TTD [i.e., temporarily totally disabled],' " and that Vera underwent surgery for his shoulder in August 2004. It stated that "[a] disability cannot be both permanent and temporary at the same time," and that "[a] medical opinion that is internally inconsistent is not substantial evidence, and therefore, cannot be relied upon to support a decision." The panel majority concluded, "[H]aving permanent disability 'on a preliminary basis', is not the same as 'the existence of permanent disability', . . . under section 4660[, subdivision ](d) . . . ."

One panel member dissented. The dissent conceded that the April 2004 report did not constitute substantial evidence of a permanent disability, but stated, ". . . I do not believe that section 4660[, subdivision] (d) requires substantial evidence," and that it "simply requires a report from 'a treating physician indicating the existence of permanent disability.' " The dissent noted that although Vera received surgery on his shoulder in August 2004, Vera received no treatment for his back after April 26, 2004, except chiropractic care, and that an MRI of his back on April 22, 2003, included abnormal findings. The dissent concluded that "the report of April 26, 2004, together with the abnormal MRI of April 22, 2003, is enough to indicate 'the existence of permanent disability.' "

Vera filed a petition for reconsideration of the WCAB's decision. He argued, among other things, that another exception enumerated in section 4660, subdivision (d) applied—specifically, the exception stating that the new schedule applies when the employer "is not required to provide the notice required by Section 4061 to the injured worker." Vera argued that his employer "[was] required subsequently to provide" the notice required by section 4061, and thus the old schedule applies.

Upon entertaining Vera's petition for reconsideration, the same divided WCAB panel confirmed its earlier decision. It stated that Vera "did not establish that one of the exceptions set forth in the third sentence of [section 4660, subdivision (d)] is applicable." The dissenting panel member adopted the reasons set forth in the earlier dissent.

Vera filed a petition for writ of review in this court, arguing that the old schedule governs his claim for permanent disability benefits, and that the WCAB therefore erred in denying his petition for reconsideration. We issued a writ of review so that we could consider the issues raised by Vera's petition.

---

indicating the existence of permanent disability." It did not discuss the third exception, applicable "when the employer is not required to provide the notice required by Section 4061 to the injured worker." (*Ibid.*)

## II

## DISCUSSION

■ As relevant here, section 4660, subdivision (d) states that the new schedule will apply to claims arising before January 1, 2005, (1) "when there has been . . . no report by a treating physician indicating the existence of permanent disability," or (2) "when the employer is not required to provide the notice required by Section 4061 to the injured worker." Vera contends that both of these exceptions apply, and that based on either of them the old schedule should govern his claim.

The resolution of this case requires us to interpret section 4660, subdivision (d) and apply it to the undisputed facts of this case. We apply a de novo standard of review when interpreting a statute, but we also apply the principle that "the WCAB's [statutory] construction is entitled to great weight unless clearly erroneous." (*Green v. Workers' Comp. Appeals Bd.* (2005) 127 Cal.App.4th 1426, 1435 [26 Cal.Rptr.3d 527] (*Green*).)

■ "Generally, in interpreting legislation, we first look to the plain or ordinary meaning of the language used to determine the Legislature's intent, unless the language is uncertain. Every word and clause is given effect so that no part or provision is useless, deprived of meaning, or contradictory." (*Green, supra,* 127 Cal.App.4th at p. 1435, fn. omitted.) " ' " 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].)

A. *January 1, 2005, Is the Relevant Cutoff Date for the Exceptions Set Forth in Section 4660, Subdivision (d)*

As an initial matter, we address an issue concerning section 4660, subdivision (d) that is not explicitly discussed by the parties but that is an important threshold issue of statutory interpretation.

Here, according to the terms of section 4660, subdivision (d), to determine whether the old schedule applies we must look for evidence of either (1) a treating physician's report indicating the existence of permanent disability or (2) the fact that Vera's employer was required to give the notice required by

section 4061.[7] However, section 4660, subdivision (d) does not provide a specific *date* by which these facts must have been in existence to trigger the application of the old schedule.

The parties both assume that *January 1, 2005,* is the relevant cutoff date. Under the parties' reading of the statute, the treating physician's report or the fact that the employer was required to give the notice required by section 4061 must exist before January 1, 2005, for the old schedule to apply.

█ We concur with this interpretation. Although the statute does not expressly set a January 1, 2005 cutoff date for the issuance of the treating physician's report or the medical-legal report or for the existence of the requirement that the employer give the notice required by section 4061, a cutoff date of January 1, 2005, should logically be implied. January 1, 2005, is the date on which the new schedule became effective. (Cal. Code Regs., tit. 8, § 9805.) The statute is thus reasonably read to mean that the new schedule can be applied to claims as of its effective date of January 1, 2005, unless, *as of the effective date of the schedule*, one of the three circumstances described in the third sentence of section 4660, subdivision (d) exists.

Another possible reading of the statute is that the old schedule applies in each case in which a medical-legal report, a treating physician's report indicating permanent disability, or a notice under section 4061 was issued at *any* point in the administrative proceedings, even *after* January 1, 2005. However, if this were the case, almost *every* permanent disability case would fall under the old schedule because *at some point* almost every case in which a claimant seeks permanent disability benefits involves either the preparation of a treating physician's report indicating the existence of permanent disability, or a medical-legal report or the giving of a section 4061 notice. Such an interpretation of the statute would make the exceptions set forth in the third sentence of section 4660, subdivision (d) so broad that they would cease to function as exceptions, and would render meaningless the Legislature's statement that the new schedule will apply "*unless*" certain exceptions apply.

We thus infer a cutoff date of January 1, 2005, for the existence of the three circumstances described in the third sentence of section 4660, subdivision (d).

---

[7] Section 4660, subdivision (d) also contains an exception for claims arising before January 1, 2005, in which there has been a medical-legal report, but that exception is not at issue in this case.

B. *The New Schedule Applies Because the Disability Was Not Yet Permanent and Stationary at the Time of the Treating Physician's Report*

We next consider the meaning of the statute's statement that the new schedule applies "when there has been . . . no report by a treating physician indicating the existence of permanent disability." (§ 4660, subd. (d).) Vera contends that to trigger this provision there need be in existence only some kind of a report from a treating physician stating that the claimant has a permanent disability, even *if* the claimant's disability has not yet reached permanent and stationary status.[8] SCIF, on the other hand, argues that to trigger this provision, the treating physician's report must indicate that the claimant's disability has reached permanent and stationary status.

As we will explain, we conclude that the treating physician's report must indicate that the claimant has a ratable disability that has reached permanent and stationary status, and that in enacting section 4660, subdivision (d), the Legislature was using the term "permanent disability" as another way of referring to the status of having a ratable disability that is "permanent and stationary."

To understand the intent of the Legislature, it will be useful to review the role that treating physicians' reports play in the process of deciding a claim for permanent disability benefits.

According to the applicable administrative regulations, a treating physician must make several reports to the claims administrator[9] throughout the course of treating an injured employee. The treating physician's first report must be made within five working days following the initial examination of the employee. (Cal. Code Regs., tit. 8, § 9785, subd. (e)(1).) Next, when certain changes occur to either the employee's condition or the employee's treatment plan during the course of treatment, or when the claims administrator reasonably seeks information, the treating physician must send a report to the claims administrator within 20 days. (Cal. Code Regs., tit. 8, § 9785, subd. (f)(1)–(7).) In addition, a treating physician must send a progress report no later than 45 days from the last report, and within 20 days of an examination. (Cal. Code Regs., tit. 8, § 9785, subd. (f)(8).)

---

[8] As defined in the regulations governing the reporting duties of a treating physician, " '[p]ermanent and stationary status' is the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 9785, subd. (a)(8).)

[9] A claims administrator is the relevant workers' compensation insurer, a self-insured employer or a third party administrator. (Cal. Code Regs., tit. 8, § 9785, subd. (a)(3).)

██ Finally, as relevant here, a treating physician is required to report within 20 days of an examination when an employee's condition has become permanent and stationary, including "any findings concerning the existence and extent of permanent impairment and limitations." (Cal. Code Regs., tit. 8, § 9785, subd. (g).)[10] The regulations specify that a treating physician may make this report on the preprinted " 'Primary Treating Physician's Permanent and Stationary Report' " form available in the regulations. (Cal. Code Regs., tit. 8, § 9785, subd. (g), referring to the form available at Cal. Code Regs., tit. 8, §§ 9785.3, 9785.4.) Thus, not until the treating physician has made a determination that the employee's status is permanent and stationary does the treating physician normally issue a report evaluating the extent of the employee's impairment as relevant to the employee's permanent disability rating.

The crucial fact for our analysis is that the treating physician's report will describe the applicable impairment and limitations *differently* depending on whether the old schedule or the new schedule applies.[11] Thus, when an employee reached permanent and stationary status before January 1, 2005 (i.e., before the effective date of the new schedule), the treating physician's report will necessarily incorporate the impairment standards applicable under the *old* schedule. Conversely, as in this case, if the employee had not yet reached permanent and stationary status before January 1, 2005, a treating physician's report will *not* have applied the old schedule in describing the employee's impairments.

██ Because a treating physician's report indicating that an employee's status has become permanent and stationary made before the promulgation of the new schedule on January 1, 2005, will necessarily incorporate an evaluation of the employee's impairment based on the *old* schedule, it is reasonable to believe that the Legislature intended the *old* schedule to apply to cases in which a treating physician had prepared a report prior to January 1, 2005.[12] Thus, we interpret the statute to mean that the old schedule will apply when, before the effective date of the new schedule, i.e., January 1,

---

[10] Indeed, "[n]o permanent disability rating can be made until the employee's injury is considered permanent and stationary." (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (2d rev. ed. 2007) § 8.03, p. 8-19 (Hanna).)

[11] Illustrating this fact, the applicable regulation states that "[f]or permanent disability evaluation performed pursuant to the permanent disability evaluation schedule adopted on or after January 1, 2005, the primary treating physician's reports concerning the existence and extent of permanent impairment shall describe the impairment in accordance with the AMA Guides to the Evaluation on Permanent Impairment, 5th Edition," and shall not be reported on the preprinted form that was used for evaluations conducted under the old schedule. (Cal. Code Regs., tit. 8, § 9785, subd. (g).)

[12] We note that if the Legislature were to have required that employees who reached permanent and stationary status before January 1, 2005, be rated based on the new schedule, the treating physician would have to create a *new* report applying the impairment standards

2005, there has been a treating physician's report indicating the status of the employee's ratable disability is permanent and stationary.

We find additional support for this interpretation of the statute in other parts of the applicable administrative regulations because in the regulations the term "permanent" disability is defined identically to "permanent and stationary status." Specifically, in the portion of the regulations governing the rating of permanent disabilities, the regulations state that "[a] disability is considered *permanent* when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 10152, italics added.) Using identical language, the portion of the regulations setting forth a treating physician's reporting duties define " '[p]ermanent and stationary status' " as "the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 9785, subd. (a)(8).)[13]

■ Thus, the regulations use the terms "permanent and stationary status" and "permanent" disability interchangeably when describing the status of a disability. We may presume that the Legislature was aware of the interchangeable use of the terms when stating that the old schedule will apply when there is a treating physician's report indicating the existence of a "permanent disability" as set forth in section 4660, subdivision (d), and that it used the term "permanent disability" as it is defined in the regulations. (Cf. *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 129 [65 Cal.Rptr.2d 580, 939 P.2d 1280] [presuming that when enacting legislation, the Legislature was aware of relevant regulations].)

---

required by the new schedule, even though the physician had earlier created a report based on the old schedule. In addition, if the Legislature were to have required that the new schedule be applied to employees who reached permanent and stationary status before January 1, 2005, despite the fact a treating physician had already evaluated the employee under the standards required by the old schedule, the basis on which the parties have made decisions in the case would be upset, including whether, under section 4061, subdivision (c) or (d), to challenge the treating physician's evaluation and obtain a comprehensive medical-legal evaluation. It is reasonable to assume that in light of these considerations, the Legislature meant to indicate that the old schedule would apply if an employee became permanent and stationary before January 1, 2005, and thus caused a treating physician to prepare a report based on the standards required by the old schedule.

[13] We quote here from the current version of both regulations. As they do now, before the amendments effective January 1, 2005, the language of the two regulations tracked each other.

We thus conclude that in drafting section 4660, subdivision (d) to refer to "a treating physician['s report] indicating the existence of permanent disability," the Legislature was making use of the interchangeable terms employed by the regulations, and intended to provide that the old schedule applies to a claim arising before January 1, 2005, when a treating physician's report indicates that the claimant's ratable disability has reached the status of permanent and stationary.

■ Applying our interpretation of the statute to Vera's case, because the treating physician's report indicated that Vera's status was not permanent and stationary, there was no "report by a treating physician indicating the existence of permanent disability." (§ 4660, subd. (d).) Accordingly, the new schedule applies to Vera's case.[14]

### C. The New Schedule Applies Because Vera's Employer Was Not Required to Provide the Notice Required by Section 4061 Before January 1, 2005

We now turn to Vera's second argument. Focusing on the statement in section 4660, subdivision (d) that the new schedule will apply "when the employer is not required to provide the notice required by Section 4061 to the injured worker," Vera contends that prior to January 1, 2005, his employer was "required to provide the notice" required by section 4061, and thus the old schedule applies to his case.

To address this issue, we first review the circumstances in which an employer is required to give notice under section 4061. Under section 4061, when an employer has been paying temporary disability payments to an employee and those payments cease, the employer is required to send a notice stating its position on the payment of permanent disability benefits.[15] Specifically, section 4061 provides in relevant part:

"(a) Together with the *last* payment of temporary disability indemnity, the employer shall . . . provide the employee one of the following:

---

[14] SCIF also argues that there was "no report by a treating physician indicating the existence of permanent disability" (§ 4660, subd. (d)), because although the treating physician's report *stated* that Vera was permanently disabled, the details of the report and other items in the record *contradict* the treating physician's assertion. Because we have concluded that the treating physician's report in this case did not "indicat[e] the existence of permanent disability" in that it stated that Vera's status was not permanent and stationary, we need not and do not discuss the alternative argument advanced by SCIF. (*Ibid.*)

[15] "Temporary disability payments cease when: (1) the employee returns to work; (2) the employee is deemed medically able to return to work; or (3) the employee's medical condition becomes permanent and stationary." (Hanna, *supra*, § 7.02[1], p. 7-7, fns. omitted.) There are also certain time limits on payments for temporary disability. (§ 4656.)

"(1) Notice either that no permanent disability indemnity will be paid because the employer alleges the employee has no permanent impairment or limitations resulting from the injury or notice of the amount of permanent disability indemnity determined by the employer to be payable. The notice shall include information concerning how the employee may obtain a formal medical evaluation pursuant to subdivision (c) or (d) if he or she disagrees with the position taken by the employer. . . . If the employer determines permanent disability indemnity is payable, the employer shall advise the employee of the amount determined payable and the basis on which the determination was made and whether there is need for continuing medical care.

"(2) Notice that permanent disability indemnity may be or is payable, but that the amount cannot be determined because the employee's medical condition is not yet permanent and stationary. The notice shall advise the employee that his or her medical condition will be monitored until it is permanent and stationary, at which time the necessary evaluation will be performed to determine the existence and extent of permanent impairment and limitations for the purpose of rating permanent disability and to determine the need for continuing medical care, or at which time the employer will advise the employee of the amount of permanent disability indemnity the employer has determined to be payable." (Italics added.)

Vera argues that we should determine that "the employer is . . . required to provide the notice required by Section 4061 to the injured worker" within the meaning of section 4660, subdivision (d) in any case in which the employer has *commenced* the payment of temporary disability benefits any time before January 1, 2005. He argues that an employer that has started paying temporary disability benefits will eventually have to *cease* making those payments, and thus *at some point* it will be "required to provide the notice required by Section 4061."

We reject this interpretation of the statute as contrary to the plain meaning of the words used by the Legislature. As section 4061 makes clear, an employer must provide the required notice "[t]ogether with the last payment of temporary disability indemnity." (§ 4061, subd. (a).) Thus, an employer is not "required to provide the notice required by Section 4061," as stated in section 4660, subdivision (d), until the employer is making the last payment of temporary disability benefits. Although an employer that has started to pay temporary disability benefits will *eventually* be required to provide the notice required by section 4061, that is not the language used by the statute. Accordingly, the plain meaning of the language at issue here is that the old schedule will apply only when the employer has made, or is required to make, the last payment of temporary disability benefits before January 1, 2005.

Further supporting this interpretation of the statute, we perceive good reason for the Legislature to have provided that the old schedule applies if, before January 1, 2005, the employer is making or is required to make the last payment of temporary disability benefits. Except for the case in which a section 4061 notice is provided to an employee whose condition is not yet permanent and stationary, an employer that prepares a section 4061 notice will necessarily have conducted an analysis to determine the permanent disability benefits that it believes are payable to the employee. Indeed, when the employer determines that permanent disability benefits are payable, it "shall advise the employee of the amount determined payable *and the basis on which the determination was made*." (§ 4061, subd. (a)(1), italics added.)

The employer's analysis and its explanation to the employee necessarily will be arrived at by applying a schedule for rating permanent disabilities. If the employer was required to provide the notice before January 1, 2005, when the new schedule was promulgated, its analysis will have been based on the *old* schedule. Thus, to preserve continuity in parties' dealings and to save the employer from having to conduct a *new* analysis and send a *new* notice premised on the *new* schedule, it is reasonable for the Legislature to have provided that the old schedule should apply in those cases where the employer has made, or is required to make, the last payment of temporary disability benefits before January 1, 2005.[16]

Applying this interpretation of the statute here, it is undisputed that Vera continued to receive temporary disability payments through February 1, 2005. Thus, according to the meaning of the phrase as used in section 4660, subdivision (d), his employer was "not required to provide the notice required by Section 4061 to the injured worker" prior to January 1, 2005. Accordingly, the new schedule governs Vera's claim for permanent disability.[17]

---

[16] The interpretation of the statute advanced by Vera would also make the statutory exception to the application of the old schedule at issue here so broad that it would cease to function as an exception. Temporary disability payments "serve[] as a substitute for wages lost by the employee during the time he or she is actually incapacitated from working" and "[i]n general terms, a 'permanent disability' is the condition remaining after an injured employee's condition has stabilized . . . ." (*City of Martinez v. Workers' Comp. Appeals Bd.* (2000) 85 Cal.App.4th 601, 608, 609 [102 Cal.Rptr.2d 588].) Thus, as a practical matter, in many cases in which a claimant seeks permanent disability benefits, there will already have been a payment of temporary disability benefits. If the old schedule were to apply in every case where an employer has made a payment of temporary disability benefits, an exception to the application of the new schedule would apply in a large number of cases in which an employee is seeking permanent disability benefits. In short, the exception would swallow the rule. (Cf. *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 902 [123 Cal.Rptr.2d 432, 51 P.3d 297] [rejecting a proffered statutory interpretation when the "exception would swallow the rule"].) We reject an interpretation of the statute that would lead to such a result.

[17] Our decision is consistent with the en banc decision of the WCAB in *Pendergrass v. Duggan Plumbing* (2007) 72 Cal.Comp.Cases 456. "[T]he Board has extensive expertise in

## DISPOSITION

The WCAB's decision is affirmed.

Benke, Acting P. J., and Aaron, J., concurred.

---

interpreting and applying the workers' compensation scheme. Consequently, we give weight to its interpretations of workers' compensation statutes unless they are clearly erroneous or unauthorized." (*Brodie, supra,* 40 Cal.4th at p. 1331.) Further, we note that *Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148 [59 Cal.Rptr.3d 611], *Zenith Ins. Co. v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 461 [62 Cal.Rptr.3d 683] and *Energetic Painting & Drywall, Inc. v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 633 also reach the same conclusion as we do here.